UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AYANNA GOOGLE,

  Plaintiff,

v.

CALHOUN COUNTY, a municipal
corporation, Sheriff STEVEN HINKLEY,
in his individual and official capacities, and
sheriff's deputies RUBEN RANGEL,
GERALD NOSTRANT, DAVID VADEN,
TEIMKA IRVING, WILLIAM HUFF,
JAMES HAMILTON, DONOVAN
SLEDGE, JESSE EASTIN, TOBIAS
KOENIG, MICHELLE LATTA, VALLEN
CAMPBELL, and ERIC STEBLETON,
each in their individual capacities,

  Defendants.

No.      -cv-

Hon.

---

**COMPLAINT AND
JURY DEMAND**

---

**GOODMAN HURWITZ & JAMES, P.C.**
Julie H. Hurwitz (P34720)
Matthew S. Erard (P81091)
Kathryn Bruner James (P71374)
684 W. Baltimore
Detroit, Michigan 48202
(313) 567-6170
jhurwitz@goodmanhurwitz.com
kjames@goodmanhurwitz.com
merard@goodmanhurwitz.com
Attorneys for Plaintiff

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

Now comes the Plaintiff, AYANNA GOOGLE, by and through counsel, GOODMAN HURWITZ & JAMES, P.C., and, for her Complaint, states as follows:

## JURISDICTION AND VENUE

1.    Plaintiff brings this action under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and the laws of the State of Michigan, seeking compensatory and punitive damages.

2.    This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4), and supplemental jurisdiction over the state claims, arising from the same nucleus of operative fact, pursuant to 28 U.S.C. § 1367(a).

3.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because all of the events giving rise to the allegations herein occurred in this District.

## PARTIES

4.    Plaintiff AYANNA GOOGLE is a resident of Kalamazoo County, Michigan.

5.    Defendant CALHOUN COUNTY is and was a municipal corporation organized under the Constitution and laws of the State of Michigan. At all times relevant hereto, it is and has been authorized by law to maintain and operate the

Calhoun County Correctional Facility ("CCCF") pursuant to Mich. Comp. Laws § 45.16.

6.      By and through its official CCCF policymaker acting in his official capacity, Defendant HINKLEY, Defendant CALHOUN COUNTY promulgated and implemented the policies, customs and practices, written and unwritten, of the CCCF with regard to the events giving rise to the cause of action herein.

7.      Defendant STEVEN HINKLEY, acting individually and in his official capacity, is and was, at all relevant times, the Sheriff of Calhoun County and official policymaker for the CCCF pursuant to Mich. Comp. Laws § 51.75, and was directly involved in the adoption, retention, and/or promulgation of the customs, policies and practices giving rise to the causes of action herein. He is sued in his individual, supervisory and official capacities.

8.      Defendant RUBEN RANGEL, acting individually and within the scope of his authority, was at all relevant times, a sheriff's deputy assigned to the CCCF. He is sued in his individual capacity.

9.      Defendant DAVID VADEN, acting individually and within the scope of his authority, was at all relevant times, a sheriff's deputy assigned to the CCCF. He is sued in his individual capacity.

10.     Defendant TEIMKA IRVING, acting individually and within the scope of her authority, was, at all relevant times, a sheriff's deputy assigned to the CCCF. She is sued in her individual capacity.

11.     Defendant WILLIAM HUFF, acting individually and within the scope of his authority, was, at all relevant times, a sheriff's deputy assigned to the CCCF. He is sued in his individual capacity.

12.     Defendant JAMES HAMILTON, acting individually and within the scope of his authority, was, at all relevant times, a sheriff's deputy assigned to the CCCF. He is sued in his individual capacity.

13.     Defendant DONOVAN SLEDGE, acting individually and within the scope of his authority, was, at all relevant times, a sheriff's deputy assigned to the CCCF. He is sued in his individual capacity.

14.     Defendant JESSE EASTIN, acting individually and within the scope of his authority, was, at all relevant times, a sheriff's deputy assigned to the CCCF. He is sued in his individual capacity.

15.     Defendant TOBIAS KOENIG, acting individually and within the scope of his authority, was, at all relevant times, a sheriff's deputy assigned to the CCCF. He is sued in his individual capacity.

16.     Defendant MICHELLE LATTA, acting individually and within the scope of her authority, was, at all relevant times, a sheriff's deputy assigned to the CCCF. She is sued in her individual capacity.

17.     Defendant VALLEN CAMPBELL, acting individually and within the scope of his authority, was, at all relevant times, a sheriff's deputy assigned to the CCCF. He is sued in his individual capacity.

18.     Defendant ERIC STEBLETON, acting individually and within the scope of his authority, was, at all relevant times, a sheriff's deputy assigned to the CCCF. He is sued in his individual capacity.

## **GENERAL ALLEGATIONS**

19.     In the spring of 2022, Plaintiff learned that she had outstanding bench warrants in from the 10th District Court, located in the City of Battle Creek, County of Calhoun, State of Michigan, arising from alleged missed court dates in two traffic and property-related misdemeanor proceedings of which she had never been notified by her assigned public defender.

20.     Despite Plaintiff's voluntary surrender to the court on June 27, 2022, following discovery of those warrants, the presiding magistrate declined to release Plaintiff on personal recognizance, and set her bail in the total amount of $500.00 via cash or surety.

21.     Upon asking Plaintiff if she had enough money to pay the bond, and being informed that Plaintiff did not, the magistrate ordered that Plaintiff be taken into custody of the Calhoun County Sheriff's Office.

22.     On information and belief, the magistrate did not state any reasons on the record for finding that Plaintiff's appearance, or the protection of the public, could not be assured in the absence of money bail, pursuant to MICH. CT. R. 6.106(E) and (F)(3).

23.     Plaintiff was then arrested, transported, and confined to pretrial detention at the CCCF.

24.     At booking, Plaintiff informed Defendants of her diagnosed affliction with anxiety and panic attacks, and the need for medication she was prescribed to manage those conditions, but CCCF staff nonetheless deprived her of medication throughout her duration of confinement.

25.     During the booking process, Plaintiff informed CCCF staff that she suffered from hidradenitis suppurativa (HS), an inflammatory skin condition causing painful abscesses in sensitive areas, of which symptoms were observed by corrections staff during the booking process strip search.

26.     Despite CCCF staff being put on notice of this condition, Plaintiff was allowed only one pair of indigent underwear, and one pair of pants that was two sizes too small, resulting in substantial exacerbation of her HS medical condition.

27.    Upon the third day of being limited to the same pair of underwear and denied access to bathing facilities, a corrections officer finally provided Plaintiff with a single change of underwear, while warning her that she would be punished if she continued to ask for any more clothing without having money in her account to pay for it.

28.    Upon changing into the fresh underwear, Plaintiff began washing the worn pair in the sink of her jail cell so that she would have a clean pair to later change into.

29.    Upon observing Plaintiff's actions, Defendant VADEN shut off running water to the sink within Plaintiff's cell.

30.    Defendants RANGEL, IRVING, and HAMILTON were aware of this unlawful act and took no steps to intervene, despite having the means and opportunity to do so.

31.    Defendants RANGEL, VADEN, IRVING, and HAMILTON then gathered outside the door to Plaintiff's cell, preparing to make entry.

32.    Seeing the gathering of officers outside the door to her cell and fearing, correctly, that she was about to be physically assaulted, Plaintiff began experiencing a panic attack and fell to her knees.

33.    Immediately upon opening the door to Plaintiff's cell, Defendant RANGEL pointed his TASER at Plaintiff and shouted, "If you don't listen, you will be shot with a TASER."

34.    Less than one second later, without giving any command for Plaintiff to *listen to* or comply with, Defendant RANGEL shot Plaintiff with two TASER probes into her shoulder area, causing Plaintiff to fall backwards against her bunk.

35.    Defendants VADEN, IRVING, and HAMILTON observed this unlawful act and took no steps to intervene in the unjustified tasings or any of the excessive force that followed over the next several minutes, despite having the means and opportunity to do so.

36.    Defendant IRVING then entered the cell, together with Defendants RANGEL, VADEN, and HAMILTON, and immediately began pressing into the carotid artery pressure point in Plaintiff's neck.

37.    Defendants VADEN, RANGEL, and HAMILTON observed this unlawful act and took no steps to intervene in the excessive force, despite having the means and opportunity to do so.

38.    Despite Plaintiff remaining on the ground and offering no resistance, Defendant RANGEL then resumed activating the TASER's electrical current only four seconds after completing the first electrical discharge.

39.    Concurrently with this second discharge, Defendant RANGEL also deployed a drive-stun electrical shock to Plaintiff's upper thigh.

40.    Defendants VADEN, IRVING, and HAMILTON observed these unlawful acts and took no steps to intervene in any of the unjustified tasings, despite having the means and opportunity to do so.

41.    Defendants then placed Plaintiff in handcuffs as she lay face-down on the floor of her cell.

42.    While still handcuffed and being led, without resistance, on foot to the restraint chair outside her cell, Defendant RANGEL once again stunned Plaintiff with the TASER, causing her to lose balance before collapsing into the chair, where she was surrounded by Defendants RANGEL, NOSTRANT, VADEN, IRVING, HUFF, HAMILTON, SLEDGE, EASTIN, KOENIG, LATTA, and CAMPBELL.

43.    Seconds later while handcuffed and seated in the chair, Defendant RANGEL deployed multiple drive-stuns to Plaintiff's legs.

44.    Concurrently with Defendant RANGEL applying drive-stuns to her legs, Defendants IRVING and HUFF each struck Plaintiff with a peroneal nerve strike to her lower left and rights legs, respectively.

45.    Defendants NOSTRANT, VADEN, IRVING, HUFF, HAMILTON, SLEDGE, EASTIN, KOENIG, LATTA, and CAMPBELL all observed these

unjustified tasings and took no steps to intervene at any time, despite having the means and opportunity to do so.

46.    Defendant IRVING then began holding Plaintiff's head down at her knees, obstructing her breathing, and forcing her to try to sit up in order to breathe.

47.    In response to Plaintiff's attempt to lean forward, Defendant IRVING twice punched Plaintiff in the back of her neck with maximum force, while continuing to obstruct Plaintiff's breathing with her other hand.

48.    The level of force used by Defendant IRVING in striking Plaintiff was enough to cause Defendant IRVING to subsequently complain of pain and numbness to her wrist.

49.     Defendants NOSTRANT, VADEN, RANGEL, HUFF, HAMILTON, SLEDGE, EASTIN, KOENIG, LATTA, and CAMPBELL all observed this series of punches and took no steps to intervene in the excessive force, despite having the means and opportunity to do so.

50.    Believing Defendant HUFF to be the only officer not being physically aggressive, despite his earlier  strike (unseen by Plaintiff at the time), and fearing she would not survive the choking by Defendant IRVING, Plaintiff clutched Defendant HUFF's shirt and cried "I can't breathe! Please! Please!," in a desperate plea for him to intervene.

51.    In response, Defendant HUFF began repeatedly punching Plaintiff's torso with maximum force, while Defendant IRVING concurrently struck Plaintiff twice with her elbow.

52.    Defendants  NOSTRANT,  VADEN,  RANGEL,  HAMILTON, SLEDGE, EASTIN, KOENIG, LATTA, and CAMPBELL all observed this series of punches and elbow strikes and took no steps to intervene in the excessive force, despite having the means and opportunity to do so.

53.    Moments later, Defendant NOSTRANT began pressing into the carotid artery of Plaintiff's neck with great force for approximately the next 90 seconds, ignoring her muffled complaints of inability to breathe, as Defendant LATTA concurrently held gauze against Plaintiff's face and mouth.

54.    Defendants  IRVING,  VADEN,  RANGEL,  HAMILTON,  SLEDGE, EASTIN, KOENIG, and CAMPBELL all observed these unlawful acts of choking and took no steps to intervene in the excessive force, despite having the means and opportunity to do so.

55.    Throughout the time of Defendants' assault on Plaintiff while she was in the restraint chair, Defendant RANGEL continued to repeatedly apply drive-stuns with his TASER against Plaintiff's back, legs, arms and side numerous times, notwithstanding that Plaintiff was continuously tightly handcuffed, causing bruising

on both wrists. The following photograph, taken immediately after her release two weeks after the incident, displays the scarring on her wrists that were still visible:



56.     At no time did Defendant RANGEL ever provide a verbal warning prior to drive-stunning Plaintiff with his TASER.

57.     Defendants IRVING, VADEN, RANGEL, HAMILTON, SLEDGE, EASTIN, KOENIG, and CAMPBELL all observed these unlawful acts of choking and took no steps to intervene in the excessive force, despite having the means and opportunity to do so.

58.     Defendants left Plaintiff fully motionless in the restraint chair for at least two hours after the assaults ended.

59.     Defendants and other CCCF staff withheld Plaintiff's access to medical care or examination following the incident and for nearly two weeks thereafter, until she was finally permitted to see a nurse on the day prior to her release.

60.    The CCCF nurse then identified and applied ointment to Plaintiff's numerous TASER burns and puncture wounds. The following photographs display the numerous skin burns and lacerations from the tasing, taken immediately upon her release from custody two weeks after the incident:



61.    At no time throughout the incident did Plaintiff ever engage in any active resistance, aggression, or threats to officers.

62.    At no time throughout the incident did any Defendant object to or intervene in the multiple acts of excessive force, despite having the means and opportunity to do so at various times throughout the assault.

63.    Based on Plaintiff's brief clutching of Defendant HUFF's shirt in her attempt to plead for his intervention, Plaintiff was subsequently charged with a felony count of assaulting, resisting, or obstructing a police officer under MICH. COMP. LAWS § § 750.81d and 750.506a(2), on which she was arraigned, while still in custody, on July 5, 2022.

64.    Immediately following the incident, Plaintiff was reclassified as a felony-charge detainee, until her release two weeks later, on July 12, 2022.

65.    The felony charge against Plaintiff, arising from the incident, was ultimately dismissed with prejudice over two years later, on October 3, 2024, following the prosecutor's motion for nolle prosequi filed that same date.

66.    Immediately following her release from the restraint chair, Defendant was further placed into a disciplinary segregation cell for 23 hours per day within the 'max wing' of the facility and informed that she would be confined there for ten days as punishment for disobeying officer commands.

67.    At the time of her detention, Plaintiff had been staying at the YWCA of Kalamazoo women's shelter with her two children for approximately two weeks, due to having become temporarily unhoused.

68.    Due to Plaintiff's failure to return to the shelter for over a week, as a result of her prolonged confinement on the felony charge, the shelter staff, in

accordance with their policy, disposed of all of Plaintiff's and her children's personal belongings at the location, including all of their clothing.

**CLAIMS FOR RELIEF**
**COUNT I**
**UNREASONABLE AND EXCESSIVE USE OF FORCE:**
**FOURTH AND/OR FOURTEENTH AMENDMENTS**
**(42 U.S.C. § 1983)**
**(Against All Defendants)**

69.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

70.    At all times relevant hereto, Plaintiff was an arrestee or a pretrial detainee.

71.    Under the Fourth Amendment and Fourteenth Amendment's Due Process Clause, arrestees and pretrial detainees are protected from being subjected to force that is excessive or unnecessary in light of the circumstances.

72.    An arrestee and/or pretrial detainee need only demonstrate that the force purposely or knowingly used against her was objectively unreasonable, i.e., that it was more force than was reasonable under the circumstances.

73.    The slight accumulation of water on the ground during Plaintiff's effort to wash the only change of underwear with which she was provided did not justify the need for a cell-extraction or tasing.

74.    Defendant RANGEL's failure to provide any warning command with which Plaintiff could have complied prior to shooting her with his TASER gun,

14

immediately following entry into her cell, further exposes that the TASER firing was objectively unreasonable.

75.    In light of the secure and closed nature of the facility, the number of officers present, and complete lack of any violent resistance or threats on the part of Plaintiff, there was no need for the use of a TASER gun in order to subdue her.

76.    Because Plaintiff was not attempting to flood her cell, had already had water to her sink shut off, and was fully subdued upon being handcuffed, the additional placement of Plaintiff in a restraint chair served no purpose other than punishment, and was thus unreasonably excessive.

77.    Each of the applications of force against Plaintiff alleged herein was conducted purposely or knowingly by the individual Defendant who exercised it.

78.    Defendants' onslaught of relentless tasing and other violence not only failed to facilitate compliance with their commands, but repeatedly prevented Plaintiff from following orders to turnover, walk, be still, and relax tensing limbs, all the while repeatedly obstructing her respiration and neuromuscular control, and drastically escalating and prolonging her panic attack through the merciless infliction of unbearable pain, terror, and fear of imminent death.

79.    Even if any of the applications of force could be potentially justified in theory or standing alone, the recurrence and degree of force used amounted to gratuitous violence intended to punish, rather than preserve security and order.

80.     It is "clearly established" in this Circuit that an individual has a "right to be free from being tased and subjected to physical force (in the alleged form of punching, knee strikes, kicking, and hitting) while not actively resisting and while being non-violent."[1] Consequently, Defendants cannot rely on the defense of qualified immunity.

81.     Even if Plaintiff's actions could be construed as resistant in any way, they would at most amount to only passive resistance, posing no danger of escape or threat of harm to officers or other detainees, and thus falling far short of any conditions that could justify repeated electrode shocks, punching, choking, elbowing, and fully incapacitating a pretrial detainee, in accordance with the Fourth Amendment and Fourteenth Amendment Due Process Clause.

82.     Each of the individual Defendants named in this matter either participated in the excessive use of force committed against Plaintiff, supervised the officers who did, or owed a duty of protection against the excessive force, while having both the opportunity and means to prevent or stop it from occurring but nevertheless failing to intervene or to otherwise protect Plaintiff from the torturous abuse.

---

[1] *Shumate v. City of Adrian*, 44 F.4th 427, 450 (6th Cir. 2022) (citing *Kijowski v. City of Niles,* 372 F. App'x 595, 601 (6th Cir. 2010)).

83.    The actions of the individual Defendants complained of herein were in accordance with the customs, usages, policies, and practices of Defendant Calhoun County.

84.    As a direct and proximate result of the acts of the Defendants complained of herein, Plaintiff has sustained the following injuries and damages, among others:

    a.  Physical injury and severe emotional harm, including but not limited to extreme pain and suffering, lumbar pain, sciatica, and other nerve and muscle damage requiring long term and ongoing physical therapy, over a dozen TASER burns, puncture wounds, and bruises to her body, extreme terror and fear of imminent death, post-traumatic stress disorder, anxiety, mental anguish, public and private humiliation, loss of dignity, loss of enjoyment of life, loss of privacy, severe nervousness, helplessness, depression, and severe mental and emotional distress, past and future;

    b.  Accompanying physical symptoms including but not limited to greatly reduced mobility and ability to remain standing due to chronic pain from the muscle and nerve damage inflicted, weight gain of over 100 pounds due to reduced mobility, sleep disturbance, worsened and more frequent panic attacks, loss of neuromuscular control, classic stress

response, trembling, loss of concentration; and exacerbation of her HS medical condition;

c. Economic damages including, but not limited to, diagnostic and medical expenses, physical therapy expenses, psychiatric counseling expenses; lost earnings and termination from employment due to lost ability to fulfill job duties of lifting and standing, inability to obtain new employment due to resulting physical injuries and disability, loss of all personal and family clothing and other belongings stored at the YWCA of Kalamazoo women's shelter, and lost employment opportunities due to having a pending felony charge; and

d. Deprivation of liberty, including but not limited to extended confinement, travel restrictions, and over two years of court supervision, deprivation of medical care, deprivation of human contact; and reduced ability to provide for and be active with her children due to loss of prior mobility, employment, and earnings.

## COUNT II
## UNCONSTITUTIONAL PUNISHMENT AND CONDITIONS OF CONFINEMENT: FOURTEENTH AMENDMENT
### (42 U.S.C. § 1983)
### (Against Defendants CALHOUN COUNTY, HINKLEY, RANGEL, HUFF, and STEBLETON)

85.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

18

86.    The substantive component of the Due Process Clause of the Fourteenth Amendment protects pretrial detainees from conditions of confinement that amount to punishment.

87.    Plaintiff had a liberty interest in being free from atypical and significant hardship in relation to the ordinary incidents of jail life.

88.    But for Plaintiff's disciplinary segregation in the 'max' wing of the jail facility for ten days, she would have been entitled to enter general population during that period.

89.    Plaintiff's placement in disciplinary segregation resulted from a wrongful disciplinary ticket for "disobeying staff orders" issued by Defendant RANGEL, with support from Defendants STEBLETON and HUFF, following the June 29, 2022 incident described herein, and with the expressed intent of punishment.

90.    In his report supporting Plaintiff's punishment, Defendant RANGEL stated, "I recommend inmate GOOGLE, AYANNA SHAWNTA serve the remainder of her quarantine time plus 20 days for disobeying staff orders and assault on staff."

91.    On information and belief, Plaintiff's transfer into disciplinary segregation was approved by Defendant HINKLEY and/or conducted pursuant to policies that Defendant HINKLEY established or retained on behalf of Defendant CALHOUN COUNTY.

19

92.    Because Plaintiff did not at any time willfully disobey staff orders as alleged, her placement in disciplinary segregation for ten days was not rationally related to a legitimate government objective or was otherwise excessive in relation to any legitimate purpose it may have served.

93.    The right of pretrial detainees to be free of punishment was clearly established at the time of the incident described herein. Consequently, Defendants cannot rely on the defense of qualified immunity.

94.    The actions of the individual Defendants complained of herein were in accordance with the customs, usages, policies, and practices of Defendant Calhoun County.

95.    As a direct and proximate result of the acts of the Defendants complained of herein, Plaintiff has sustained the following injuries and damages:

    a.  Physical injury and severe emotional harm, including but not limited to extreme pain and suffering, lumbar pain, sciatica, and other nerve and muscle damage requiring long term and ongoing physical therapy, over a dozen TASER burns, puncture wounds, and bruises to her body, extreme terror and fear of imminent death, deprivation of needed medical care while incarcerated, post-traumatic stress disorder, anxiety, mental anguish, public and private humiliation, loss of dignity, loss of

enjoyment of life, loss of privacy, severe nervousness, helplessness, depression, and severe mental and emotional distress, past and future;

b.  Accompanying physical symptoms including but not limited to greatly reduced mobility and ability to remain standing due to chronic pain from the muscle and nerve damage inflicted, weight gain of over 100 pounds due to reduced mobility, sleep disturbance, worsened and more frequent panic attacks, classic stress response, trembling, and loss of concentration; and exacerbation of her HS medical condition;

c.  Economic damages including, but not limited to, diagnostic and medical expenses, physical therapy expenses, psychiatric counseling expenses; lost earnings and termination from employment due to lost ability to fulfill job duties of lifting and standing, inability to obtain new employment due to resulting physical injuries and disability; loss of all personal and family clothing and other belongings kept at the YWCA of Kalamazoo women's shelter, and lost employment opportunities due to having a pending felony charge; and

d.  Deprivation of liberty, including but not limited to extended confinement, travel restrictions, and over two years of court supervision, deprivation of medical care, deprivation of human contact;

and reduced ability to provide for and be active with her children, due to loss of prior mobility, employment, and earnings.

## COUNT III

### DEPRIVATION OF PROCEDURAL DUE PROCESS: FOURTEENTH AMENDMENT
### (42 U.S.C. § 1983)
### (Against Defendants CALHOUN COUNTY, HINKLEY, RANGEL, HUFF, and STEBLETON)

96.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

97.    The procedural component of the Due Process Clause prohibits corrections officers from subjecting detainees to atypical and significant hardship in relation to the ordinary incidents of jail life, without due process.

98.    Prior to her subjection to ten days of disciplinary segregation in the 'max wing' of the jail facility, Plaintiff was unconstitutionally deprived of both the opportunity to present evidence in her defense and of a written decision explaining the finding of her guilt.

99.    On information and belief, Plaintiff's punitive placement into disciplinary segregation without pre-deprivation process was approved by Defendant HINKLEY and/or conducted pursuant to policies that Defendant HINKLEY established or retained on behalf of Defendant CALHOUN COUNTY.

22

100.   The right of incarcerated persons to be free of deprivations of liberty without the pre-deprivation process requirements referenced above was clearly established at the time of the incidents complained of herein. Consequently, Defendants cannot rely on the defense of qualified immunity.

    a. As a direct and proximate result of the acts of the Defendants complained of herein, Plaintiff has sustained the following injuries and damages, among Physical injury and severe emotional harm, including but not limited to extreme pain and suffering, lumbar pain, sciatica, and other nerve and muscle damage requiring long term and ongoing physical therapy, over a dozen TASER burns, puncture wounds, and bruises to her body, extreme terror and fear of imminent death, deprivation of needed medical care while incarcerated, post-traumatic stress disorder, anxiety, mental anguish, public and private humiliation, loss of dignity, loss of enjoyment of life, loss of privacy, severe nervousness, helplessness, depression, and severe mental and emotional distress, past and future;

    b. Accompanying physical symptoms including but not limited to greatly reduced mobility and ability to remain standing due to chronic pain from the muscle and nerve damage inflicted, weight gain of over 100 pounds due to reduced mobility, sleep disturbance, worsened and more

frequent panic attacks, classic stress response, trembling, and loss of concentration; and exacerbation of her HS medical condition;

c.   Economic damages including, but not limited to, diagnostic and medical expenses, physical therapy expenses, psychiatric counseling expenses; lost earnings and termination from employment due to lost ability to fulfill job duties of lifting and standing, inability to obtain new employment due to resulting physical injuries and disability; loss of all personal and family clothing and other belongings kept at the YWCA of Kalamazoo women's shelter, and lost employment opportunities due to having a pending felony charge; and

d. Deprivation of liberty, including but not limited to extended confinement, travel restrictions, and over two years of court supervision, deprivation of medical care, deprivation of human contact; and reduced ability to provide for and be active with her children, due to loss of prior mobility, employment, and earnings.

**COUNT IV**
**INHUMANE CONDITIONS OF CONFINEMENT:**
**FOURTEENTH AMENDMENT**
**(42 U.S.C. § 1983)**
**(Against Defendants CALHOUN COUNTY,**
**HINKLEY, RANGEL, IRVING, HAMILTON and  VADEN)**

101.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

102.    Defendants had an affirmative duty under the Fourteenth Amendment to provide Plaintiff and other detainees with the basic elements of hygiene, including clean clothing.

103.   By compelling Plaintiff to wear the same underwear for multiple days, causing severe exacerbation of and suffering from her HS medical condition of which they were on notice, Defendants both deprived her of the minimal civilized measure of life's necessities and acted with reckless disregard for Plaintiff's rights and with deliberate indifference to a serious medical need.

104.    Defendants RANGEL, IRVING, HAMILTON, and VADEN further compounded the above deprivation by shutting off water to Plaintiff's cell and brutally attacking Plaintiff in response to her efforts to pursue her only available means of sanitization and relief.

105.   Defendants further deprived Plaintiff of basic hygiene by denying her access to bathing facilities.

106.   Both the right to humane conditions of confinement, including access to clean clothing, and the right to be free of deliberate indifference to a serious medical need, were clearly established at the time of the incidents complained of herein. Therefore, Defendants cannot rely on the defense of qualified immunity.

107.   On information and belief, the custom, usage, policy, or practice of denying indigent pretrial detainees clean clothing was approved by Defendant

HINKLEY and/or conducted pursuant to policies that Defendant HINKLEY established or retained on behalf of Defendant CALHOUN COUNTY.

108.   As a direct and proximate result of the injuries and damages complained of herein, Plaintiff has suffered the following injuries and damages among others:

    a.   Physical injury and severe emotional harm, including but not limited to extreme pain and suffering, lumbar pain, sciatica, and other nerve and muscle damage requiring long term and ongoing physical therapy, over a dozen TASER burns, puncture wounds, and bruises to her body, extreme terror and fear of imminent death, deprivation of needed medical care while incarcerated, post-traumatic stress disorder, anxiety, mental anguish, public and private humiliation, loss of dignity, loss of enjoyment of life, loss of privacy, severe nervousness, helplessness, depression, and severe mental and emotional distress, past and future;

    b.   Accompanying physical symptoms including but not limited to greatly reduced mobility and ability to remain standing due to chronic pain from the muscle and nerve damage inflicted, weight gain of over 100 pounds due to reduced mobility, sleep disturbance, worsened and more frequent panic attacks, classic stress response, trembling, and loss of concentration; and exacerbation of her HS medical condition;

c. Economic damages including, but not limited to, diagnostic and medical expenses, physical therapy expenses, psychiatric counseling expenses; lost earnings and termination from employment due to lost ability to fulfill job duties of lifting and standing, inability to obtain new employment due to resulting physical injuries and disability; loss of all personal and family clothing and other belongings kept at the YWCA of Kalamazoo women's shelter, and lost employment opportunities due to having a pending felony charge; and

d. Deprivation of liberty, including but not limited to extended confinement, travel restrictions, and over two years of court supervision, deprivation of medical care, deprivation of human contact; and reduced ability to provide for and be active with her children, due to loss of prior mobility, employment, and earnings.

**COUNT V**
***MONELL* LIABILITY:**
**FOURTH AND/OR FOURTEENTH AMENDMENTS**
**(42 U.S.C. § 1983)**
**(Against Defendant CALHOUN COUNTY)**

109.   By so restraining Plaintiff's liberty as to render her unable to care for herself, Defendant CALHOUN COUNTY, through its agents, assumed the constitutional obligation to provide for Plaintiff's basic needs of clean clothing and

reasonably adequate hygiene, especially while on notice of Plaintiff's inflammatory skin condition.

110.   Defendant CALHOUN COUNTY's policy of depriving clean underwear to indigent detainees, necessitating Plaintiff's action of attempting to wash her only other pair in the sink of her cell, was the catalyst and proximate cause of all ensuing events complained of herein.

111.   Defendant CALHOUN COUNTY has officially adopted a facially unconstitutional 'Non-Lethal Use of Force Policy,' which authorized and continues to authorize the use of TASER devices in response to both active and inactive resistance, including their use "[t]o maintain order within the facility" and for any "[o]ther legitimate job related functions that would require gaining/maintaining control of a subject or situation."

112.   The above-referenced policy further leaves the matter of "repeated application of the TASER" entirely to the applying officer's discretion, so long as it is given post-hoc justification in a Use of Force Report based on "criteria" of the officer's own invention.

113.   On information and belief, Defendant CALHOUN COUNTY, through its chief policymaker, Defendant HINKLEY, condoned, established and/or maintained customs, usages, policies and/or practices of:

a.  Deliberately indifferent failure to adequately train corrections staff on the Constitution's limits on the use of electronic control weapons, hand, fist, and elbow strikes, dangers of airway restriction, and bodily restraints against pretrial detainees;

b.  Deliberately indifferent failure to adequately train corrections staff on appropriate engagement and de-escalation in encounters with nonviolent detainees suffering panic attacks and mental health crises;

c.  Deliberately indifferent failure to supervise corrections staff in their application of electronic control weapons, hand, fist, and elbow strikes, pressure point manipulation, and bodily restraints against pretrial detainees and inmates;

d.  Deliberately indifferent failure to adequately investigate and discipline corrections staff engaging in excessive force against pretrial detainees and inmates;

e.  Subjecting pretrial detainees to punishment by way of expressed intent and/or without rational relation to, or in excess of, any legitimate nonpunitive governmental purpose;

f.  Depriving pretrial detainees subject to institutional disciplinary charges of the opportunity to present evidence in their defense, and of a written decision explaining a finding of guilt; and

g.  Tolerance and collective indifference to all of the above.

114.   Each of the above customs, usages, policies and/or practices was a moving force in causing and creating Plaintiff's injuries, as set forth herein, and in causing and creating individual Defendants' violations of Plaintiff's constitutional rights as set forth in Counts I, II, III and IV above, as set forth herein.

115.   Defendant County, acting through its Sheriff's Office, failed to train its corrections officers on appropriate use of a restraint chair. Specifically, the County failed to provide guidance, training or supervision to ensure that excessive force, such as punching, striking, choking, and other demonstrations of unnecessary force are used on inmates seated in a restraint chair.

116.   The need for such guidance, training and supervision is, and was at all relevant times herein, patently obvious for any law enforcement agency that uses a restraint chair. In Calhoun County in 2022, it was particularly obvious due to a pattern of corrections officers using excessive force on inmates in the restraint chair, including at least one high-profile case that resulted in criminal charges against a Calhoun County corrections officer. [2]

---

[2] *See* Andrew Minegar, *Video shows Calhoun County corrections officer punch a restrained inmate*, WWMT (Oct. 1, 2021), https://wwmt.com/news/local/video-shows-calhoun-county-corrections-officer-punch-a-restrained-inmate

117.   At the CCCF, Immigration and Customs Enforcement (ICE) detainees are virtually indistinguishable from those held on state criminal charges, sharing the same, housing, uniforms, supervision, and general discipline.

118.   In response to the repeated abuses against an ICE detainee client last year, the American Civil Liberties Union and Michigan Immigrant Rights Center publicly called for an investigation into the CCCF's practices of "limiting access to medically necessary services, mistaking insubordination/other behavior as purposeful and not as a result of disabilities, and using excessive force and disciplinary segregation as punishment," among other abuses.[3]

119.   In 2019, an investigation by the United States Department of Homeland Security's Office for Civil Rights and Civil Liberties found that the CCCF's "use of the restraint chair. . .on mentally ill detainees is problematic" and that "[d]ocumentation of efforts to resolve the situation via consultation with and assessment and intervention by mental health were warranted but were lacking in all cases reviewed."[4]

---

[3] Steve Nealing, *Immigrant with disabilities repeatedly assaulted by deputies at CCCF, civil rights groups allege*, Detroit Metro Times (April 25, 2024), https://www.metrotimes.com/news/immigrant-with-disabilities-repeatedly-assaulted-by-deputies-at-calhoun-county-jail-civil-rights-groups-allege-36107644

[4] United States Dep't of Homeland Security Office for Civil Rights & Civil Liberties, *Investigation Regarding Calhoun County Correctional Center Battle Creek, Michigan* (Aug. 8, 2019), pp. 11, 14, https://www.scribd.com/document/881504373/DHS-Civil-Rights-Report-Calhoun-County-Jail

120.   These and other incidents were known by policymakers in the County, including the Sheriff's Office, making them aware of the need for new or different supervision and training, and yet they declined to provide it.

121.   As a direct and proximate result of the COUNTY's customs, usages, policies, and/or practices complained of herein, Plaintiff has sustained the following injuries and damages, among others:

a.   Physical injury and severe emotional harm, including but not limited to extreme pain and suffering, lumbar pain, sciatica, and other nerve and muscle damage requiring long term and ongoing physical therapy, over a dozen TASER burns, puncture wounds, and bruises to her body, extreme terror and fear of imminent death, deprivation of needed medical care while incarcerated, post-traumatic stress disorder, anxiety, mental anguish, public and private humiliation, loss of dignity, loss of enjoyment of life, loss of privacy, severe nervousness, helplessness, depression, and severe mental and emotional distress, past and future

b.   Accompanying physical symptoms including but not limited to greatly reduced mobility and ability to remain standing due to chronic pain from the muscle and nerve damage inflicted, weight gain of over 100 pounds due to reduced mobility, sleep disturbance, worsened and more

frequent panic attacks, classic stress response, trembling, and loss of concentration; and exacerbation of her HS medical condition;

c. Economic damages including, but not limited to, diagnostic and medical expenses, physical therapy expenses, psychiatric counseling expenses; lost earnings and termination from employment due to lost ability to fulfill job duties of lifting and standing, inability to obtain new employment due to resulting physical injuries and disability; loss of all personal and family clothing and other belongings kept at the YWCA of Kalamazoo women's shelter, and lost employment opportunities due to having a pending felony charge; and

d. Deprivation of liberty, including but not limited to extended confinement, travel restrictions, and over two years of court supervision, deprivation of medical care, deprivation of human contact; and reduced ability to provide for and be active with her children, due to loss of prior mobility, employment, and earnings.

## COUNT VI
## <u>MALICIOUS PROSECUTION:</u>
## <u>FOURTH AMENDMENT</u>
### (42 U.S.C. § 1983)
### (Against Defendants RANGEL, HUFF, and STEBLETON)

122. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

123.   A law enforcement or corrections officer is liable for Fourth Amendment malicious prosecution when that officer made, influenced, or participated in a decision to prosecute a plaintiff without probable cause, and, pursuant to a legal process, the Plaintiff suffered a resulting deprivation of liberty.

124.   Pursuant to MICH. COMP. LAWS § 750.81d, "the offense of resisting and obstructing requires that an officer's actions are lawful."[5]

125.   Because the force and violence being committed against Plaintiff at the time of the alleged offense was unlawful and undertaken in reckless or deliberate disregard for Plaintiff's rights, Defendants had no probable cause to believe that Plaintiff had committed the aforementioned felony offense.

126.   On the contrary, Plaintiff's attempt to summon the intervention of Defendant HUFF was intended only to plead with him to exercise his legal duty to intervene and stop the unlawful and assaultive abuse then occurring.

127.   Among numerous other false statements in his report in support of the felony charge, Defendant RANGEL falsely alleged that, upon opening Plaintiff's cell door, he ordered Plaintiff "one last time to get handcuffed or she would be tased," when he never gave any order at all prior to tasing her, thus never having given such a warning or instruction *before* deploying his TASER.

---

[5] *People v. Moreno*, 814 N.W.2d 624, 633 (Mich. 2012).

128.    Among numerous other false statements in his report in support of the felony charge, Defendant STEBLETON falsely alleged that Plaintiff was "physically fighting while [deputies] attempted to restrain her" and "was lifting Deputies [sic] up, while they attempted to restrain her."

129.    While still detained, Plaintiff was arraigned on the felony charge on July 5, 2022, prolonging her detention and conditioning her release on an additional cash or surety bond which she did not then have the means to pay.

130.    Because the elements of Fourth Amendment malicious prosecution are clearly established in this Circuit, Defendants cannot rely on the defense of qualified immunity.

131.    The actions of the individual Defendants complained of herein were in accordance with the customs, usages, policies, and practices of Defendant Calhoun County.

132.    As a direct and proximate result of the acts of the Defendants complained of herein, Plaintiff has sustained the following injuries and damages, among others:

    a. Physical injury and severe emotional harm, including but not limited to extreme pain and suffering, lumbar pain, sciatica, and other nerve and muscle damage requiring long term and ongoing physical therapy, over a dozen TASER burns, puncture wounds, and bruises to her body,

extreme terror and fear of imminent death, deprivation of needed medical care while incarcerated, post-traumatic stress disorder, anxiety, mental anguish, public and private humiliation, loss of dignity, loss of enjoyment of life, loss of privacy, severe nervousness, helplessness, depression, and severe mental and emotional distress, past and future;

b.  Accompanying physical symptoms including but not limited to greatly reduced mobility and ability to remain standing due to chronic pain from the muscle and nerve damage inflicted, weight gain of over 100 pounds due to reduced mobility, sleep disturbance, worsened and more frequent panic attacks, classic stress response, trembling, and loss of concentration; and exacerbation of her HS medical condition;

c.  Economic damages including, but not limited to, diagnostic and medical expenses, physical therapy expenses, psychiatric counseling expenses; lost earnings and termination from employment due to lost ability to fulfill job duties of lifting and standing, inability to obtain new employment due to resulting physical injuries and disability; loss of all personal and family clothing and other belongings kept at the YWCA of Kalamazoo women's shelter, and lost employment opportunities due to having a pending felony charge; and

d.  Deprivation of liberty, including but not limited to extended
    confinement, travel restrictions, and over two years of court
    supervision, deprivation of medical care, deprivation of human contact;
    and reduced ability to provide for and be active with her children, due
    to loss of prior mobility, employment, and earnings

### COUNT VII
### <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>
### (Michigan common law)
### (Against Defendants RANGEL, NOSTRANT, VADEN, IRVING, HUFF, HAMILTON, SLEDGE, EASTIN, KOENIG, LATTA, CAMPBELL, and STEBLETON)

133.  Plaintiff incorporates by reference all preceding allegations as though
fully set forth herein.

134.  Defendants' actions of repeatedly tasing, beating, and choking Plaintiff,
despite her complete lack of any active resistance or aggression, amounted to
atrocious and outrageous conduct that is utterly intolerable in a civilized
community, and from which Plaintiff has suffered extreme emotional distress.

135.  Having subjected Plaintiff to such abuses with malicious intent, in
dereliction of legal duties of a ministerial nature and/or without good faith or
accurate or reasonable belief that they were acting in the legitimate scope of their
authority, Defendants are not entitled to governmental immunity under Michigan
law.

136.   In engaging in the offensive conduct complained of herein, Defendants intended to cause emotional injury to Plaintiff or recklessly disregarded the probability that Plaintiff would suffer such harm.

137.   As a direct and proximate result of the acts of the Defendants complained of herein, Plaintiff has sustained the following injuries and damages, among others:

a. Physical injury and severe emotional harm, including but not limited to extreme pain and suffering, lumbar pain, sciatica, and other nerve and muscle damage requiring long term and ongoing physical therapy, over a dozen TASER burns, puncture wounds, and bruises to her body, extreme terror and fear of imminent death, deprivation of needed medical care while incarcerated, post-traumatic stress disorder, anxiety, mental anguish, public and private humiliation, loss of dignity, loss of enjoyment of life, loss of privacy, severe nervousness, helplessness, depression, and severe mental and emotional distress, past and future;

b. Accompanying physical symptoms including but not limited to greatly reduced mobility and ability to remain standing due to chronic pain from the muscle and nerve damage inflicted, weight gain of over 100 pounds due to reduced mobility, sleep disturbance, worsened and more

frequent panic attacks, classic stress response, trembling, and loss of concentration; and exacerbation of her HS medical condition;

c.  Economic damages including, but not limited to, diagnostic and medical expenses, physical therapy expenses, psychiatric counseling expenses; lost earnings and termination from employment due to lost ability to fulfill job duties of lifting and standing, inability to obtain new employment due to resulting physical injuries and disability; loss of all personal and family clothing and other belongings kept at the YWCA of Kalamazoo women's shelter, and lost employment opportunities due to having a pending felony charge; and

d.  Deprivation of liberty, including but not limited to extended confinement, travel restrictions, and over two years of court supervision, deprivation of medical care, deprivation of human contact; and reduced ability to provide for and be active with her children, due to loss of prior mobility, employment, and earnings

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant Plaintiff the following relief against all Defendants, jointly and severally:

A.  Adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter in controversy in order that such declarations

39

shall have the force and effect of final judgment and that the Court retain

jurisdiction of this matter for the purpose of enforcing the Court's orders;

B. Award Plaintiff compensatory damages for the physical, emotional, and

economic injuries she has suffered by reason of Defendants' unlawful

conduct, in an amount that is fair, just and reasonable, as determined by

the trier of fact;

C. Award Plaintiff punitive and exemplary damages, as to the natural person

Defendants, to the extent allowable by law;

D. Award Plaintiff her costs and reasonable attorney fees pursuant to Fed. R.

Civ. P. 54(d)(1) and 42 U.S.C. § 1988(b); and

E. Award Plaintiff any and all further relief that the Court finds equitable

and just.

Respectfully submitted,

**GOODMAN HURWITZ & JAMES, P.C.**

By: */s/ Julie H. Hurwitz*_____
  Julie H. Hurwitz (P34720)
  Kathryn Bruner James (P71374)
  Matthew S. Erard (P81091)
  1394 E. Jefferson Avenue
  Detroit, Michigan 48207
  (313) 567-6170
  jhurwitz@goodmanhurwitz.com
  kjames@goodmanhurwitz.com
  merard@goodmanhurwitz.com
Dated: June 27, 2025    Attorneys for Plaintiff

## **JURY DEMAND**

Plaintiff demands a trial by jury on each and every one of her claims.

Respectfully submitted,

**GOODMAN HURWITZ & JAMES, P.C.**

By: */s/ Julie H. Hurwitz*
  Julie H. Hurwitz (P34720)
  Kathryn Bruner James (P71374)
  Matthew S. Erard (P81091)
  1394 E. Jefferson Ave.
  Detroit, MI 48207
  (313) 567-6170
  jhurwitz@goodmanhurwitz.com
  kjames@goodmanhurwitz.com
  merard@goodmanhurwitz.com
Dated: June 27, 2025  Attorneys for Plaintiff

41